**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 6, 2015**

# In the Court of Appeals of Georgia

A15A1413.  WINTERBOER  v.  FLOYD  HEALTHCARE MANAGEMENT, INC d/b/a FLOYD MEDICAL CENTER.

DILLARD, Judge.

Janice Winterboer appeals the trial court's denial of her motion for summary judgment and its grant of summary judgment to Floyd Healthcare Management, Inc. d/b/a Floyd Medical Center ("Floyd Medical Center") on the latter's complaint as to unpaid medical bills for treatment of Winterboer's now-deceased adult son, Joshua, after she signed Joshua's hospital-registration consent forms. Winterboer contends, *inter alia*, that she signed the forms in a representative capacity and not as a personal guarantor. We agree that the trial court erred in granting summary judgment to Floyd Medical Center and in denying Winterboer's motion and, accordingly, we reverse.

Viewed in the light most favorable to Winterboer, the nonmovant,[1] the record reflects that her adult son, Joshua, was severely incapacitated after a motor-vehicle accident that occurred when he was a toddler. Although Joshua had no guardian or conservator, and although Winterboer did not have financial or medical power of attorney for Joshua, she provided full-time care for her son until his death in December 2014. Winterboer paid for Joshua's medical and living expenses using trust funds that were received as part of an annuity following the accident and a legal settlement.

On April 25, 2011, and June 22, 2011, Winterboer took Joshua to Floyd Medical Center for emergency medical treatment when he was in respiratory distress and, at some point in the process of his admission, she signed registration consent forms for his treatment. But when the medical bills associated with these extended hospital visits went unpaid, Floyd Medical Center filed suit against both Joshua *and*

---

[1] *See, e.g.*, *Blake v. KES, Inc.*, 329 Ga. App. 742, 742 (766 SE2d 138) (2014) ("On appeal from the grant of summary judgment this Court conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (punctuation omitted)).

Winterboer, contending that Winterboer personally guaranteed payment of her son's bills when she signed the registration consent forms.[2]

Subsequently, Winterboer and Joshua moved for summary judgment, and the trial court denied their motions. Floyd Medical Center then filed for summary judgment in November 2014. But before the trial court could rule upon this motion, Joshua passed away in December 2014. Joshua's counsel then filed a suggestion of death, and Floyd Medical Center consented to dismissing its action against him. Nevertheless, the action against Winterboer continued, and she responded and again moved for summary judgment in January 2015.

---

[2] It is not entirely clear from the record why the medical bills were never paid, but there is a suggestion by Winterboer's counsel in the summary-judgment-hearing transcript that the total amount for the bills exceeded the maximum amount that could be withdrawn from Joshua's trust fund in a given month. Winterboer also testified in her deposition that she attempted to free up funds from another source but was thwarted by her ex-husband. According to Winterboer, after all of this transpired, Joshua was placed on Medicaid and, to her knowledge, all subsequent hospital bills were covered by that source.

We also note that Floyd Medical Center's complaint originally sought to collect unpaid medical bills for a third hospital visit as well, but the signor on those forms was Joshua's cousin, not Winterboer. Nevertheless, Floyd Medical Center did not pursue a claim against the cousin, only Joshua and Winterboer, and the claim for unpaid bills associated with this third visit was eventually abandoned by Floyd Medical Center's dismissal of its claim against Joshua because it conceded at the summary-judgment hearing that it was not seeking to recover those funds from Winterboer.

Following a hearing on Floyd Medical Center's motion for summary judgment, the trial court granted the motion, again denied summary judgment as to Winterboer by adopting the reasoning of the earlier denial, and awarded Floyd Medical Center $243,204.96 for the unpaid medical bills associated with Joshua's hospital visits in April and June 2011. This appeal by Winterboer follows.

1. Winterboer first argues that the trial court erred in granting summary judgment to Floyd Medical Center and denying her motion when she signed the registration consent forms in a representative capacity and not a personal capacity. We agree.

The forms Winterboer signed in April and June of 2011, entitled "Registration Consent," are identical. At the top of the form in all capital letters appears the following paragraph:

> I, the patient, hereby request that I receive treatment/care during this hospital admission, emergency [department] or outpatient visit. I understand that if I am to be provided a series of ongoing services based on my physician's orders, that my consent and authorization will be acquired only once for all services provided in the series. I voluntarily make and execute the following authorizations, consents, assignment, certification and requests.

4

From there, centered upon the page and appearing in bold, all-capital font, the form contains a header for the "patient's authorization and consent for medical and surgical treatment, anesthesia, x-ray examination, consent to search, physical restraints, disposal of tissues, and other related matters." The two paragraphs that follow in small, standard font then detail and provide the patient's authorization for those things, speaking in terms of what "I," the patient, consents to by signing the document.

Next, centered on the page and appearing in bold, all-capital font, the form contains a header for the "patient's assignment of insurance benefits for hospital/physician services, guarantee of account, and authorization for release of medical information." It is the paragraph that appears beneath this header in small, standard font that contains the language at issue in this appeal. The entire paragraph provides as follows:

> I hereby irrevocably transfer and assign to the Hospital, EDP and all other physicians all insurance benefits otherwise payable to me but not to exceed the Hospital's or EDP's or all other physicians regular charges rendered to me for this period of hospitalization. I authorize my insurance carrier, third party payor or managed care organization to pay such benefits directly to the Hospital, EDP and all other physicians in my behalf. *I understand that I am financially responsible to the*

5

*Hospital, EDP and all other physicians for charges not paid under the assignment.* In the event that in addition to hospital, EDP and all other physicians' benefits, I am entitled to any insurance or other benefits covering other physician services, I hereby assign said benefits to the physicians rendering care or treatment to me during this stay or outpatient visits, to be applied to my bill from such physician. *For and in consideration of services rendered by the Hospital, EDP, or other physicians to the below named patient, the undersigned jointly and severally if more than one) guarantees payment of all charges incurred for said patient in accordance with the policy of payment of such bills. I understand that I am financially responsible to the Hospital for charges not paid under the assignment.* I further authorize any holder of medical information or records concerning me to release such information or records to my insurance carrier, third party payor, managed care organization or to any other insurance carrier, including worker's compensation carriers, against which I have made, or shall hereafter make, a claim. I further understand that it may be necessary to contact my past or present employer(s) in regards to this claim. I permit a copy of this authorization to be used in place of the original.[3]

After this paragraph, the form contains two more centered, bold, all-capitalized headers for "patient's Medicare certification, authorization to release information, and payment request" and "Medigap and medical assistance," each followed by a

---

[3] We have supplied emphasis to the most pertinent language, but have otherwise copied the language of the paragraph exactly as it appears, including grammatical and typographical errors that are original to the form.

paragraph in small, standard font detailing the patient's authorizations and certifications related to those headers.

Finally, at the bottom of the form are three lines for signatures or other information, each line describing in all-capitalized font what information is to be provided. The first line is for the "signature of the patient." The second line is for the "signature of person acting for patient." And the third line provides an area for the person "acting for [the] patient" to describe his or her "relationship to patient" and the date.

Below the three signature lines are three boxes that may be checked. The first box is to indicate that "[i]t is impractical for the patient to execute the document because patient's mental or physical condition is such that patient should not be asked to transact business." The second box is to indicate that "[t]he patient is a minor." And the third box is to indicate the signor's acknowledgment that he or she has "received smoking cessation information from the hospital."[4] Additionally, in the bottom right-hand corner of the form is a small area entitled "patient identification,"

---

[4] It is not pertinent to the issues on appeal, but we note that this third box was checked on both forms.

7

and below this, applied by a typed sticker, are, *inter alia*, the patient's name, the patient's age and gender, the name of the attending physician, and the date.

In this matter, there are slight differences in the way Winterboer signed the form in April 2011 and the manner in which she signed the form in June 2011. On the April 2011 form, there is no patient name listed on the "signature of patient" line, but Winterboer signed her name on the line for "signature of person acting for patient" and identified herself as the patient's "mother" on the line for "relationship to patient." She also checked the box indicating that it was "impractical for the patient to execute the document because patient's mental or physical condition is such that patient should not be asked to transact business." And the "patient identification" area on this form lists "Winterboer, Joshua David" as the patient.

On the June 2011 form, Winterboer signed her name on the "signature of patient" line and wrote in her son's name, Joshua Winterboer, on the line for the "signature of person acting for patient" before identifying herself as the patient's "mother" on the line for "relationship to patient." She also not only checked that it was "impractical for the patient to execute the document because patient's mental or physical condition is such that patient should not be asked to transact business" but

8

also that "[t]he patient is a minor." Despite these obvious scrivener errors, the "patient identification" area lists "Winterboer, Joshua David" as the 30-year-old patient.

Based upon Winterboer's completion of these forms and the language emphasized *supra*, Floyd Medical Center maintains that Winterboer personally guaranteed payment of her son's medical bills. The trial court agreed, once again determining that Winterboer, "in signing the form, obligated her son to be responsible for the payment and obligated herself as well." But we disagree that Winterboer was rendered personally liable for payment of the associated bills simply because she signed the forms in a representative capacity on behalf of her son.

At the outset, we note that the issue of contract construction is "usually a question of law for the court to resolve and, as such, it is subject to *de novo* review."[5] In this respect, there are three steps involved in the construction of a contract.[6] First, the court must decide whether "the language of the contract is clear and

---

[5] *Atlanta Emergency Servs., LLC v. Clark*, 328 Ga. App. 9, 11 (1) (761 SE2d 437) (2014); *see also Bd. of Comm'rs of Crisp Cty. v. City Comm'rs of the City of Cordele*, 315 Ga. App. 696, 699 (727 SE2d 524) (2012).

[6] *See Atlanta Emergency Servs.*, 328 Ga. App. at 11 (1); *Bd. of Comm'rs of Crisp Cty.*, 315 Ga. App. at 699.

unambiguous."[7] And if there is no ambiguity, the contract is enforced "according to its plain terms, and the contract alone is looked to for meaning."[8] Of course, a contract is unambiguous when it is "capable of only one reasonable interpretation."[9] In the second step, if the contract is ambiguous in some respect, "the rules of contract construction must be applied by the court to resolve the ambiguity."[10] Finally, if ambiguity remains after applying the rules of construction, "the issue of what the ambiguous language means and what the parties intended must be resolved by a jury."[11]

---

[7] *Atlanta Emergency Servs.*, 328 Ga. App. at 11-12 (1) (punctuation omitted); *accord Bd. of Comm'rs of Crisp Cty.*, 315 Ga. App. at 699.

[8] *Atlanta Emergency Servs.*, 328 Ga. App. at 12 (1) (punctuation omitted); *accord Bd. of Comm'rs of Crisp Cty.*, 315 Ga. App. at 699; *see also* OCGA § 13-2-3 ("The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction.").

[9] *Atlanta Emergency Servs.*, 328 Ga. App. at 12 (1) (punctuation omitted); *accord Stefano Arts v. Sui*, 301 Ga. App. 857, 860 (1) (690 SE2d 197) (2010).

[10] *Atlanta Emergency Servs.*, 328 Ga. App. at 12 (1) (punctuation omitted); *accord Bd. of Comm'rs of Crisp Cty.*, 315 Ga. App. at 699.

[11] *Atlanta Emergency Servs.*, 328 Ga. App. at 12 (1) (punctuation omitted); *accord Bd. of Comm'rs of Crisp Cty.*, 315 Ga. App. at 699.

As noted *supra*, the form at issue includes the following sentence buried in the middle of a paragraph that is under a header that highlights, *inter alia*, the *patient's* guarantee of account:

> For and in consideration of services rendered by the Hospital, EDP, or other physicians to the below named patient, the undersigned jointly and severally if more than one) guarantees payment of all charges incurred for said patient in accordance with the policy of payment of such bills. I understand that I am financially responsible to the Hospital for charges not paid under the assignment.[12]

Notwithstanding this language, which broadly applies to "the undersigned," the form contains signature lines for the patient and for a "person *acting for* [the] patient."[13] The form then permits additional information to describe who is signing on behalf of the patient and *why* that person is doing so by providing a line for the person's "relationship to [the] patient" and boxes to be checked if "[i]t is impractical for the patient to execute the document because [the] patient's mental or physical condition is such that [the] patient should not be asked to transact business" and/or if "[t]he patient is a minor."

---

[12] Typographical errors in original.

[13] Emphasis supplied.

11

These conflicting portions of the form—the language broadly associated with guaranteeing payment and the lines and boxes associated with who is signing the form and *why*—render the contract ambiguous.[14] Nevertheless, we are mindful that "[t]he construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part[.]"[15] Thus, here, the broad guarantee language must be read in *pari materia* with the signature lines *and* the check-boxes that provide additional information relevant to the unique circumstances that surround the signing of the form at a given time. Additionally, it is a cardinal rule of contract construction that

---

[14] *Cf. Bd. of Trustees of N. Kan. City. Mem. Hosp. v. Conway*, 675 SW2d 36, 36-39 (I) (Miss. Ct. App. 1984) (holding that wife made an "unambiguous, unqualified promise . . . to pay for hospital services rendered to" her husband when she signed a document that was separate from the patient's registration form, which she did not sign and which listed her husband as the "person responsible for this account," and when the separate document was entitled "Guarantee of Account" and provided "I will pay any unpaid balance on dismissal" and "I agree to be responsible for hospital services rendered to this patient").

[15] OCGA § 13-2-2 (4); *see also Paul v. Paul*, 235 Ga. 382, 384 (219 SE2d 736) (1975) ("Every other rule is subservient to this one. 'The fundamental rule, the rule which swallows up almost all others in construing a paper, is to give it that meaning which will best carry into effect the intent of the parties. This is the object of the rules of interpretation, to discover the true intent of the parties, and in doing this we are to take the whole of (the instrument) together, and to consider this with the surrounding circumstances."(punctuation omitted)).

12

when "the construction of a contract is doubtful, the construction that goes most strongly against the drafter of the agreement is to be preferred."[16]

In the case *sub judice*, Winterboer left a checkmark to indicate that she was signing the form because it was impractical for the patient, her adult son, "to execute the document because [the] patient's mental or physical condition [was] such that [the] patient should not be asked to transact business." Additionally, the signature line provides that a signatory other than the patient is "acting *for* the patient." Thus, it is clear that Winterboer intended to sign—and did sign—the form in a representative capacity because these latter portions of the form limit the otherwise broad guarantee provision.

---

[16] *Reichman v. Southern Ear, Nose & Throat Surgeons, P.C.*, 266 Ga. App. 696, 699-700 (1) (598 SE2d 12) (2004); *see also* OCGA § 13-2-2 (5) ("If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred[.]"); *Hertz Equip. Rental Corp. v. Evans*, 260 Ga. 532, 533 (397 SE2d 692) (1990) (citing to OCGA § 13-2-2 (5) for the proposition that "if a contract is capable of being construed two ways, it will be construed against the preparer and in favor of the non-preparer").

And here, because Winterboer signed the form on behalf of her adult son as his agent, not in a personal capacity, she did not render herself personally liable for any unpaid medical bills.[17] Accordingly, the trial court erred in granting summary judgment to Floyd Medical Center and in denying summary judgment to Winterboer.

2. Because we have reversed on Winterboer's first enumeration of error, we need not address her remaining enumerations, which are that the form does not satisfy the statute of frauds, and that the form is a contract of adhesion with a personal-guaranty provision that is unconscionable and void as against public policy.

---

[17] *See* OCGA § 10-6-53 ("The form in which the agent acts is immaterial; if the principal's name is disclosed and the agent professes to act for him, it will be held to be the act of the principal."); *Dover v. Burns*, 186 Ga. 19, 21-22, 29 (3) (196 SE 785) (1938) (holding that attorney's brothers-in-law were not rendered personally liable in settlement of attorney's accounts when the agreement described the brothers-in-law as "agents of" the attorney); *Tiller v. Spradley*, 39 Ga. 35, 35-38 (1869) (holding that note promising to pay "for cotton seed for J.'s plantation" and signed, "S., Agent for J.," was the note of J., who was alone personally liable). *Cf.* OCGA § 31-9-2 (a) (6) (B) ("In addition to such other persons as may be authorized and empowered, any one of the following persons is authorized and empowered to consent, either orally or otherwise, to any surgical or medical treatment or procedures not prohibited by law which may be suggested, recommended, prescribed, or directed by a duly licensed physician: . . . . Upon the inability of any adult to consent for himself or herself and in the absence of any person to consent under paragraphs (1.1) through (5) of this subsection, the following persons in the following order of priority: . . . Any parent for his or her adult child[.]").

For all of the foregoing reasons, we reverse the trial court's grant of summary judgment to Floyd Medical Center and its denial of summary judgment to Winterboer.

*Judgment reversed. McFadden, J., concurs. Ellington, P. J., concurs in judgment only.*